Jerome S. KALUR and Donald W. Large,
Plaintiffs,

v.

Stanley R. RESOR, Individually and as
Secretary of the Army, et al.,
Defendants.

Civ. A. No. 1331–71.

United States District Court,
District of Columbia.

Dec. 21, 1971.

Jerome S. Kalur, Cleveland, Ohio, Donald W. Large, Madison, Wis., for plaintiffs.

Thomas A. Flannery, U. S. Atty., Martin Green and Thomas C. Lee, Department of Justice, Washington, D. C., for defendants.

## OPINION

AUBREY E. ROBINSON, Jr., District Judge.

This is an action brought by plaintiffs for declaratory judgment and injunctive

relief under the provisions of 28 U.S.C. Sections 2201, 2202. The jurisdiction of this Court is invoked under 28 U.S.C. Section 1331, and 5 U.S.C. Sections 702, 706. Plaintiffs Jerome S. Kalur and Donald Large are consistent users of the Grand River in Northeastern Ohio. They use the river for numerous conservational and recreational activities. This suit is brought by them on behalf of all persons and conservation groups that are similarly situated. Defendants Resor, Ruckelshaus, and Clarke are duly appointed United States Government employees and are respectively, Secretary of the Army, Administrator of the Environmental Protection Agency, and Chief of Engineers for the Army Corps of Engineers.

The suit requires the interpretation of The Rivers and Harbors Act of 1899, Section 13 (Refuse Act).[1] This section prohibits the discharge of refuse into any navigable water, or tributary of any navigable water. The same section provides that the Secretary of the Army may permit the deposit of "refuse" in navigable waters.[2] In 1971, pursuant to Executive Order Number 11574,[3] the Corps of Engineers, Department of the Army, promulgated regulations [4] covering the issuance of these permits. These regulations included the power to issue permits to dump "refuse" into navigable waters of the United States and into any tributary where its flow would reach a navigable water.[5]

Plaintiffs aver that the defendants have exceeded their statutory authority, and continue to do so, in issuing permits under the terms of these regulations. Plaintiffs claim that the defendants have absolutely no authority or right to order the issuance of permits to deposit "refuse" matter into non-navigable waterways of the United States and the Grand River of Ohio in particular.

In addition to the above, plaintiffs' complaint alleges a further violation of environmental laws on the part of defendants. The National Environmental Policy Act [6] states that all agencies of the federal government shall . . . "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the re-

---

1. 33 U.S.C. Section 407 (1971).

2. 33 U.S.C. Section 407 (1971) reads: It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft of any kind, or from the shore, wharf, manufacturing establishment, or mill of any kind, any refuse matter of any or description whatever . . ., into any navigable water of the United States, or into any tributary of any navigable water from which the same shall float or be washed into such navigable water; and it shall not be lawful to deposit, or cause, suffer, or procure to be deposited material of any kind in any place on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water, . . . *And provided further* That the Secretary of the Army, whenever in the judgment of the Chief of Engineers anchorage and navigation will not be injured thereby, may permit the deposit of any material above mentioned in navigable waters, within limits to be defined and under conditions to be prescribed by him, provided application is made to him prior to depositing such material; and whenever any permit is so granted the conditions thereof shall be strictly complied with, and any violation thereof shall be unlawful."

3. 3 C.F.R., 1966–1970 Comp., pp. 986–87; 35 Fed.Reg. 19627, Dec. 23, 1970.

4. Permits For Discharges or Deposits Into Navigable Waters, 33 C.F.R. Section 209.131 (1971); 36 Fed.Reg. 6564 (1971).

5. *Id.* "(a) *Purpose and scope.* This section prescribes the policy, practice and procedure to be followed . . . with applications for permits authorizing discharges or deposits in navigable waters . . . or into any tributary from which discharged or deposited matter shall float or be washed into a navigable water."

6. 42 U.S.C. Section 4321 et seq. (1971).

sponsible official" on the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, alternatives to the proposed action, the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.[7] This Act, the plaintiffs state, is subverted and violated by the regulations issued by the Corps of Army Engineers wherein they exempt the Corps from making such a detailed statement in all cases where the question is solely one of water quality.[8]

The defendants deny that they have acted in excess of their statutory authority or in violation of the National Environmental Policy Act. There being no questions of fact in dispute the parties have briefed the issues of law. These issues are now before this Court for determination on cross motions for Summary Judgment. It is the finding of this Court that the defendants have acted in excess of their statutory authority and also, in violation of the National Environmental Policy Act.

## I

Defendants initially challenge this Court's jurisdiction over the subject matter. Their claim is that plaintiffs lack standing to sue as required by Article III of the United States Constitution. Defendants enunciate a two step test to determine whether standing exists.[9]

First, plaintiff must allege that the actions of the defendants have caused him injury in fact. Second, that the interests plaintiffs seek to protect are arguably within the zone of interests to be protected by the statute or constitutional guarantee in question. An application of these tests supports the view that plaintiffs have standing to sue.

■ The dispute is presented in an adversary proceeding. The plaintiffs are aggrieved parties. Their injuries stem from their aesthetic and environmental concerns for the Grand River, and other non-navigable streams in the States of Ohio and Wisconsin.[10] The gist of the question of standing is whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness will occur. This adversity sharpens the presentation of issues, and Courts rely upon this for the illumination of difficult questions.

■ Standing exists when the plaintiff alleges that the challenged action has caused him injury in fact, *economic* or *otherwise*.[11] Defendants, in their brief, recognized that federal courts have granted standing to persons or groups that have asserted the threat of destruction of public resources and amenities.[12] Defendants aver that several decisions establish that in order to have standing in

7. 42 U.S.C. Section 4332(2) (C) (1971).

8. 33 C.F.R. Section 209.131(L) (2) (1971) ; 36 Fed.Reg. 6570 (1971).

9. These steps were enunciated by the Supreme Court in Association of Data Processing Service Organization v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969) ; Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969).

10. Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1969) ; Association of Data Processing Service Organization v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969) ;

Scenic Hudson Preservation Conf. v. F.P.C., 354 F.2d 608 (2nd Cir. 1965).

11. Association of Data Processing Service Organization, *supra* note 9, 397 U.S. at 152, 90 S.Ct. 827.

12. Brief For Defendant In Support Of Motion For Summary Judgment, Kalur v. Resor, Civil Action No. 1331–71, December 16, 1971, where the following cases were cited: a. Scenic Hudson Preservation Conference v. F.P.C., 354 F.2d 608 (2nd Cir., 1965) ; b. Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2nd Cir., 1970) ; c. West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232 (4th Cir., 1971).

environmental suits the party must be directly affected by the governmental activity involved, and that without a showing of a more direct interest, standing in the legal sense is not established.[13]

■ These cases are distinguishable. There, the plaintiffs were suing based solely upon their desire to protect the public interest. The courts were unable to find any other interest or contact that those plaintiffs had with the subject matter of the suit.[14] Here, taking the material allegations of the plaintiffs' complaint as true,[15] the plaintiffs have direct contacts with non-navigable waters; they are conservationists who regularly engage in canoeing and other forms of outdoor water recreational activities, and they are constant users of the Grand River and other non-navigable waters in Ohio and Wisconsin.

■ The second test, that the interests plaintiffs seek to protect are arguably within the zone of interests to be protected, was directly approached by the Supreme Court in Association of Data Processing Service Organization v. Camp.[16] The Court stated:

The "legal interest" test goes to the merits. The question of standing is different. It concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complaint is arguably within the zone of interests to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. Thus the Administrative Procedure Act grants standing to a person "aggrieved by agency action within

the meaning of a relevant statute." (5 U.S.C. § 702 (1964) ed., Supp. IV) *That interest, at times, may reflect "aesthetic, conservational, and recreational"* as well as economic values. Scenic Hudson Preservation Conf. v. F.P.C., [2 Cir.] 354 F.2d 608, 616; Office of Communication of United Church of Christ v. F.C.C., 123 U.S. App.D.C. 328, 334–340, 359 F.2d 994, 1000–1006. (Emphasis added.) [17]

Thus, defendants' two pronged test is met. First, the injury alleged is to plaintiffs' environmental interest in the Grand River. Such interests were recognized as sufficient in *Data Processing*. Second, these interests are arguably within the zone of interests to be protected or regulated by the Refuse Act and the National Environmental Policy Act. Both of these statutes encompass the environmental interests in the waters of the United States that the plaintiffs possess. These plaintiffs, therefore, have standing to sue under the edicts of the Supreme Court and through the Administrative Procedure Act. Their environmental interests, and their personal contact with and use of the waters in question, are protected.

II

■ Defendants next allege the lack of a case or controversy. In deciding whether a case or controversy exists, one must look to the rigorous set of rules as to what constitutes a justiciable case or controversy as laid down by the Supreme Court. The judicial power of this Court extends to all cases and controversies as designated under our Constitution. Cases, however, are not to be de-

---

13. Sierra Club v. Hickel, 433 F.2d 24 (9th Cir., 1970), cert. granted, 401 U.S. 907, 91 S.Ct. 870, 27 L.Ed.2d 805 (1971); Alameda Conservation Assoc. v. California, 437 F.2d 1087 (9th Cir. 1971).

14. Alameda Conservation Assoc. v. California, *supra* note 13, at 1089–1090; Sierra Club v. Hickel, *supra* note 13, 433 F.2d at 29–30.

15. Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969).

16. 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

17. *Id.* at 153, 90 S.Ct. at 830. The "legal interest" test, in going to the merits need only be decided to the extent that one can say that his interests arguably are protected, and have been infringed by agency action, all within the meaning of a relevant statute. This test is met.

cided in a vacuum. The judicial power may be applied only in those instances where questions arise in a case or controversy. A "controversy" in the constitutional sense must be one that is appropriate for judicial determination.[18] A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot.[19] The controversy must be definite and concrete, touching legal relations of parties having adverse legal interests.[20] Controversies must be real and substantial, admitting of specific relief through a decree of a conclusive character. This distinguishes them from advisory opinions on what the law would be upon a hypothetical state of facts. Courts must limit their decisions to concrete cases where questions are precisely framed in clashes of genuine adversary argument that explores the penumbra of every issue.[21] Focusing on the key elements, it is imperative that Courts look to the nature of the case before them, the interests of the parties involved, and the relief sought by them in determining whether they may extend their judicial power to the case. All three factors are inexorably intertwined in the decision.

■ As examined above, the legal interests involved in this case are sufficient to meet the standards of a "case and controversy." The government argues that this is not a situation meeting the requirements for a "case and controversy." They point to alleged vagueness of the facts and lack of injury to the plaintiffs. The defendants note that the public issues are of such importance and complexity that they should not be decided on speculative facts as an abstract question. Further, defendants state that no permits have been issued under the regulations in dispute, and no dumping of refuse has occurred due to such permits that would injure the plaintiffs' interests. The defendants call for judicial restraint to await the developments of the permit program. They aver that plaintiffs may bring any objections to the permit program before the Corps of Engineers when they hold hearings on the issuance of particular permits.

■ Defendants' arguments are without merit. It remains unchallenged that the regulations have been promulgated. There is contemplated no further action by the Corps of Engineers as to their content or expanse. The Supreme Court, in Abbott Laboratories v. Gardner,[22] upheld the availability of pre-enforcement judicial review of a regulation challenged as promulgated in excess of a government agent's authority under the law. There the Supreme Court rejected the same arguments forwarded here by defendants, and held that the issues were appropriate for judicial resolution because the issues were solely legal, and no further administrative rule-making procedures were contemplated. Unless there is a showing of clear and convincing evidence that Congress did not want judicial review of this question, then aggrieved persons may obtain review of administrative decisions.[23] The fact that hearings are to be held upon some individual applications for permits does not aid the person who desires to challenge the authority of the agency to issue those permits initially.[24]

18. Osborn v. Bank of United States, 9 Wheat. 738, 819, 6 L.Ed. 204 (1824).

19. United States v. Alaska S. S. Co., 253 U.S. 113, 116, 40 S.Ct. 448, 64 L.Ed. 808 (1920).

20. South Spring Hill Gold Min. Co. v. Amador Gold Co., 145 U.S. 300, 301, 12 S.Ct. 921, 36 L.Ed. 712 (1891); Massachusetts v. Mellon, 262 U.S. 447, 487, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

21. United States v. Fruehauf, 365 U.S. 146, 157, 81 S.Ct. 547, 5 L.Ed.2d 476 (1961).

22. 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

23. Id. at 141, 87 S.Ct. 1507.

24. Cf. Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

In Toilet Goods Association v. Gardner,[25] the Supreme Court set out two conditions that need be met to determine reviewability. First, are the tendered issues appropriate for judicial review? Second, what is the hardship to the parties should review be denied? Here, *Abbott Labs*. dictates the answer to the first condition. The issues are appropriate for review. The hardship to the parties, if review should be denied, is explicitly suggested by the revelation that twelve corporations have either submitted applications for permits to dump refuse into the Grand River, or have noted their intent to do so. If permits to dump are issued, the aesthetic and environmental interests recognized by the Courts as protectable would be infringed by water pollution. The hardship that would be caused by delay at this juncture clearly outweighs any of the contentions put forth by the defendants.

■ The issue presented to this Court is purely a legal one. The regulations constitute final agency action. An administrative agency's regulations may have the force of law both before and after their sanctions are invoked.[26] As evidenced by the briefs presented here, the validity of the regulations themselves is a question that brings these adverse parties before the Court. The regulations herein challenged authorize the Corps of Engineers to issue permits for the Grand River in Ohio and other non-navigable waterways. Plaintiffs claim this is beyond their statutory power under the Rivers and Harbors Act and the National Environmental Policy Act. These are legal questions needing no further factual context in which to be decided. There is no indication of Congressional intent that would prevent judicial review of the regulations at this or any other time. Moreover, this controversy is definite, concrete, and touching on the legal relations of the parties who have adverse legal interests. Specific relief is available to the plaintiffs. Furthermore, this is not based upon a hypothetical state of facts or presented in an abstract form. Defendants readily admit that twelve companies have or intend to ask for permits to dump in the very river that plaintiffs seek to protect. The imminence of harm that flows from implementation of these regulations permits this Court to conclude that a "case and controversy" exists.

### III

Defendants request that this suit be dismissed as it is an unconsented suit against the United States. They state that if the relief sought would expend itself on the public treasury or require affirmative action or inaction by the Federal officers in the performance of their official duties, the suit is in effect a suit against the sovereign. They note that since defendants are asked to account for their actions performed in their official capacities the relief sought would operate directly against the United States.

■ In the present case plaintiffs claim that the various named government officials have acted outside of and in excess of any statutory authority conferred upon them. Such a claim clearly takes this action outside the scope of sovereign immunity, for if the plaintiffs' claim proves true, the actions of the defendants must be considered individual rather than sovereign acts.[27] The defendants readily admit that sovereign immunity does not apply if the exercise or power in a particular case by a government official is constitutionally void. The defendants state, however, that this

25. 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed. 2d 697 (1967).

26. Columbia Broadcasting System v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942).

27. Abbott Laboratories v. Celebrezze, 228 F.Supp. 855 (D.Del.1964), *aff'd sub nom.* Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ; Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949) ; Parker v. United States, 307 F.Supp. 685 (D. Colo.1969).

exception to the rule does not apply here, as they can find no showing in the complaint that any of the alleged actions of the defendants are beyond the scope of statutory powers or unconstitutional by virtue of being done under an unconstitutional statute. The clear reading of the complaint establishes beyond a reasonable doubt that this is the very allegation being made by the plaintiffs. This is the exact question to be reached on the merits of this case. Have these federal officers acted outside their statutory powers, or if acting within those powers, have they exercised those powers in this case in a constitutionally void manner? Sovereign immunity is not a bar to this action.

## IV

Defendants allege that this is an injunction suit against the Federal Government, and as such, the Court has no jurisdiction over it, as there is no jurisdiction to maintain an injunction suit against the United States. This claim, like the claim for sovereign immunity, goes to the merits of the complaint's allegations. Is this a suit against the United States, or is it a suit against these defendant individuals for acting in excess of their statutory authority? Where government officials act in excess of their authority injunctive relief is authorized. The cases are legion permitting this injunctive relief in "environmental" contexts, where it has been determined that government officials have acted in excess of their bounds.[28]

## V

The Rivers and Harbors Act (Refuse Act) provides the following prohibition:

It shall not be lawful to throw, discharge, or deposit, or cause, suffer, or procure to be thrown, discharged, or deposited either from or out of any ship, barge, or other floating craft . . . or from the shore, . . ., manufacturing establishment, . . . any refuse matter of any kind or description whatever . . ., *into any navigable water of the United States, or into any tributary of any navigable water* from which the same shall float or be washed into such navigable water . . . .

. . . . . .

(P)rovided further, That the Secretary of the Army, . . ., may permit the deposit of any material above mentioned in *navigable waters* . . . . (Emphasis added.)[29]

The proviso clause of this Act was never fully implemented until the President signed Executive Order 11574 on December 23, 1970.[30] This Order established a permit program under the Act to regulate discharges of pollutants and other refuse matter into the navigable waters of the United States.

On April 7, 1971, the Secretary of the Army published the challenged regulations.[31] These regulations prescribe the policy, practice and procedure to be followed by all Corps of Engineers installations and activities in connection with applications for permits authorizing discharges or deposits in navigable waters of the United States or into any tributary from which such discharged or deposited matter shall float or be washed into a navigable water.[32]

The plaintiffs allege that the regulations, as promulgated, extend beyond statutory authorization the Corps of Engineer's permit authority in that it includes as areas subject to permit issuance, tributaries of navigable waterways where discharge into those waters would

---

28. Environmental Defense Fund v. Corps of Engineers of United States Army, 324 F.Supp. 878 (D.D.C., 1971); Environmental Defense Fund v. Corps of Engineers, 325 F.Supp. 728, 753 (E.D.Ark., 1970).

29. 33 U.S.C. Section 407 (1971).

30. 3 C.F.R., 1966–1970 Comp., pp. 986–87; 35 Fed.Reg. 19627, Dec. 23, 1970.

31. Permits For Discharges or Deposits Into Navigable Waters, 33 C.F.R. Section 209.131 (1971); 36 Fed.Reg. 6564 (1971).

32. *Id.* at Section 209.131(a).

float or be washed into a navigable waterway. The defendants proffer that the authority to issue permits for the discharge of refuse matter is as broad as the scope of the prohibition from dumping refuse into waterways in the statute; therefore, the Chief of Engineers may lawfully issue permits to persons desiring to discharge refuse into tributaries of navigable waters.

Pointing to past cases interpreting this Act,[33] defendants insist that the purpose underlying the enactment of the Refuse Act precludes a narrow reading of the statute. The cases cited, however, merely discuss the term "refuse" as defined within the Act.[34] "Refuse" has been held to have broad dimensions. This does not lend support for the defendants reading of the permit clause of the Act. The reason for the broad reading given to the word "refuse" is abundantly clear. The purpose of the Act required that the prohibition against dumping "refuse" into our waters be as broad as possible. Nowhere in the cases is there any discussion of limiting this broad prohibition other than as specifically stated within the Act. None of the cases cited to this Court remotely discuss the permit clause and its scope.

Defendants argue further, that although deposits into non-navigable tributaries that wash into navigable streams are prohibited, there is no indication in the legislative history that Congress meant the prohibition on discharges into tributaries to be any more absolute than the prohibition on discharges into the navigable waters themselves. Defendants posit that when refuse is discharged into a non-navigable tributary, and that refuse floats into a navigable stream, that at that point the Corps of Engineers may issue a permit for the deposit. From this, they argue, that considerations would not differ for the issuance of a permit at either juncture, therefore the Refuse Act Permit Program should

be construed broadly to allow the issuance of permits for the dumping of refuse into both navigable and non-navigable waters. Without this power to issue permits to Companies located on non-navigable waters the defendants state that industrial plants would find themselves in a position of being in violation of the Act without ability to bring themselves into compliance short of closing. This would be true even if the plant's discharges were in no manner violating the other standards of water quality.

We are dealing here with the statutory grant of authority given to the Secretary of the Army to issue permits for the dumping of "refuse" into non-navigable waterways that eventually lead into navigable waters. The law is clear. The Secretary of the Army does not have that power under the Refuse Act. The regulations, therefore, insofar as they purport to vest in the Corps of Engineers and the Secretary of the Army such authority are hereby declared *ultra vires* and of no effect.

An examination of the statute indicates that it is divided into two parts, the first part setting forth the prohibition against the "discharge . . . of refuse matter", and the second part providing an exception for permits for such discharges by the Chief of Engineers. The first part, or prohibition applies by its terms to "any navigable water, *or . . . any tributary of any navigable water . . .*." (Emphasis added.) Discharges of "refuse" matter are clearly prohibited in both navigable waters and in non-navigable tributaries of navigable waters.

The second part of the section, pertaining to the permits provision, is more limited in scope. The Secretary of the Army "may permit the deposit of any material above mentioned in *navigable waters . . .*." (Emphasis added.) This separate proviso makes no mention

---

33. United States v. Standard Oil Co., 384 U.S. 224, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1965); United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903 (1959).

34. *Id.*

of tributaries in contrast to the specific language in the prohibition part of the section. The conclusion that is drawn from this language is that the Corps of Engineers has no authority to authorize deposits of refuse matter in non-navigable tributaries of navigable waterways. The prohibition part of this section is plainly larger than the exception for permits. Had Congress intended that the language of the exception be read to include tributaries it had only to use the precise language that it used in describing the scope of the prohibition against discharging refuse. As the Supreme Court often has stated, the legislative history of a statute cannot radically affect the Court's interpretation if the language of the statute is clear.[35]

Defendants desire that this Act be construed broadly to effectuate its remedial purpose. They cite cases to this effect.[36] Indeed, these cases are the principal reason why the Refuse Act is of use today in the effort to control environmental destruction of the nation's waterways. The definition of "refuse" is of broad scope. The dumping of refuse into a waterway covered by this Act is a criminal violation, and as such is subject to the usual rules regarding strict construction. Statutes cannot be construed broadly to create criminal violations out of whole cloth. A clearly established criminal prohibition, however, such as this section, cannot be administered out of existence by the defendants' attempt to exceed their clearly defined statutory authority. In United States v. Republic Steel Corporation the Supreme Court declined an invitation to expand the exception for the dumping of "refuse" in stating: "We follow the line Congress has drawn and cannot accept the invitation to broaden the exception in § 13 because other matters 'in a liquid state' might logically have been treated as favorably as sewage is treated."[37] This Court similarly declines defendants invitation to expand a clearly drawn exception in Section 13. Once a polluter has received a permit from the Corps of Engineers to dump "refuse" into a non-navigable waterway, the polluter is shielded from prosecution so long as he stays within the permit's terms. Shields from prosecution for otherwise criminal offenses should not be broadly distributed. The clear language of the section delimits those areas where permits may be issued.

The cases cited by defendant make the Rivers and Harbors Act an effective weapon in the attempt to improve the quality of the nation's waterways. Until recently, no permits were ever issued under the Act. Every person depositing refuse into the nation's waters was and is in violation of this Act. This fact, coupled with the United States Attorneys' power to obtain injunctive relief, makes the Act simple and effective. There can be no remorse for those companies who have since 1899 violated the criminal law who now find themselves in the position of being unable to comply with the law. Defendants' permit program only hinders the effectiveness of Congress' intent to keep our waterways clean for both navigation and environmental reasons. Congress did not want non-navigable waters to be subjected to the dumping of "refuse." It is of little effect that any "refuse" illegally dumped in a non-navigable water could be legally dumped in a navigable waterway if a permit were issued.[38]

35. United States v. Oregon, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947).

36. *Supra*, note 33.

37. 362 U.S. at 491, 80 S.Ct. at 890.

38. Congress, when it passed the Refuse Act, had in mind only the question of navigability. This may be why they did not extend the permit exception to non-navigable waters. The general prohibition on dumping was to prevent navigable waters from being blocked up by what flows into them from non-navigable trib-

The statutory prohibition against dumping protects non-navigable tributaries. The United States Attorney's office, therefore, has authority under this Act to prosecute violators who dump "refuse" into non-navigable waterways where such discharge would find its way into a navigable waterway. The regulations in issue here act to undermine this authority and instead of serving a remedial purpose, they are in fact, aiding to perpetuate and cloak the already mass obviation of the Refuse Act by corporate entities. There are many clean and still unspoiled rivers, streams, and lakes that do not fall within the expanding definition of "navigable." Many of these are suitable for canoeing, fishing, swimming and other recreational pursuits. Such pure streams can be preserved as the Act absolutely prohibits deposits of refuse matter into them. Defendants may not go beyond their legal authority to issue permits that shield polluters and potential polluters where Congress has specifically prohibited such activity.

## VI

■■■ The National Environmental Policy Act (NEPA) takes the major step of requiring all federal agencies to consider values of environmental preservation in their spheres of activity, prescribing certain procedural measures to ensure that those values are in fact fully respected.[39] Plaintiffs argue that regulations recently adopted by the Corps of Engineers to govern consideration of environmental matters fail to satisfy the rigor demanded by the NEPA.[40] The defendants contend that since the Corps of Engineers is an agency dedicated to guarding the environment, that the provisions and purposes of NEPA do not rationally apply to it. This Court finds the policies embodied in NEPA to be clear. The regulations issued by the Corps of Engineers and acquiesced in by the other defendants do not comply with the congressional policy requiring detailed statements. Hence, further rule-making is ordered.

The National Environmental Policy Act reads in part:

(A) ll agencies of the Federal Government shall

. . . . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

1. the environmental impact of the proposed action,

2. any adverse environmental effects which cannot be avoided should the proposal be implemented,

3. alternatives to the proposed action,

4. the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and,

utaries. Congress clearly did not want refuse to float or wash into navigable waters from non-navigable waters. Congress made provision only for that refuse to be dumped in navigable waters. Clearly, Congress did not want "refuse" placed in the non-navigable waters. The defendants state that they should be permitted to regulate dumping in both areas, as the considerations are similar. As similar as the permit considerations may be, there are definite differences involved. Plant location, enforcement difficulties, and extended water pollution into non-navigable waters are all factors to be weighed that are different from considera-

tions as to navigable waters. Congress did not want plants located on non-navigable tributaries to extend pollution of any degree other than as delimited.

39. 42 U.S.C. Section 4321 et seq. (1971); Calvert Cliffs' Coord. Com. v. United States Atomic Energy Commission, 449 F.2d 1109 (D.C. Cir., 1971).

40. Brief for Plaintiffs In Support Of Motion For Summary Judgment, Kalur v. Resor, Civil Action No. 1331–71, December 16, 1971 (D.D.C., 1971); 42 U.S.C. Section 4332(2) (c) (1971); 33 C.F.R. Section 209.131(L) (2) (1971); 36 Fed.Reg. 6570 (1971).

5. any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.[41]

The Corps of Engineers and the other defendants in this case rely upon the remarks of several Senators on the floor of the Senate in positing the argument that they are not bound by NEPA's requirement that "all agencies" of the government must file a detailed statement as outlined above.[42] They argue this position in support of the following regulation:

(2) Section 102(2) (C) statements will not be required in permit cases where it is likely that the proposed discharge will not have any significant impact on the human environment. Moreover, the Council on Environmental Quality has advised that such statements will not be required where the only impact of proposed discharge or deposit will be on water quality and related water quality considerations because these matters are specifically addressed under subsections 21(b) and (c), the Federal Water Pollution Control Act, as amended.[43]

It must be noted here, that if no detailed statement is required when the only impact of the proposed discharge will be on water quality and related considerations, the Corps of Engineers has successfully eliminated from its purview most of the times when reports would otherwise be required. As the permits are issued to allow refuse to be dumped into navigable waters it would appear that water quality considerations should be foremost in that agencies decision making process.[44]

The recent case of Calvert Cliffs' Coord. Com. v. United States Atomic Energy Commission [45] is dispositive of this question. There, the Circuit Court for the District of Columbia scrutinized NEPA, its policies, and the total picture of the Act's legislative history in deciding that the Atomic Energy Commission violated NEPA in providing that no party may raise, and the Commission may not independently examine, any problem of water quality. There the Commission indicated that it would defer totally to water quality standards administered by state agencies and approved by the federal government under the Federal Water Pollution Control Act. This is a similar regulation to the one presently before this Court. Here too the agency involved has rejected the requirements of filing a detailed statement when concerned with water quality, in deference to the Federal Water Pollution Control Act. Here also, the agency has abdicated much of its decision making responsibility on water quality. Recognizing the expertise of the Environmental Protection Agency (EPA), the Corps will accept the findings, determinations and interpretation, as the Regional Representative of the EPA decides, concerning the applicability of water quality considerations upon requests for permits to dump refuse into navigable waters.[46] Even if disagreement should arise between the Regional Director of the EPA and the Corps District Engineer, the Secretary of the Army, after due consultation, shall accept the findings, determinations, and interpretations of the Administrator of EPA as to water quality standards and related water quality considerations.[47] This is analogous to the Atomic Energy Commission stating

41. 42 U.S.C. Section 4332(2) (c) (1971).

42. 115 Cong.Rec. 40417, 40418 (Remarks of Senator Jackson) ; 115 Cong.Rec. 40423, 40425 (Remarks of Senator Muskie).

43. 33 C.F.R. Section 209.131(L) (2) ; 36 Fed.Reg. 6564 (1971).

44. The original purpose of Section 13 was essentially to eliminate obstructions to

navigation and interference with public works projects. This, however, has been expanded to cover environmental purposes, including water quality, Zabel v. Tabb, 430 F.2d 199 (5th Cir., 1970).

45. 449 F.2d 1109 (D.C.Cir. 1971).

46. 33 C.F.R. Section 209.131(d) (8), (9), (10).

47. *Id.*

that it would not independently examine any problem of water quality. These cases having distinctions without meaning it is held that the *Calvert Cliffs'* reasoning applies here with equal force.

■ The Court found in *Calvert Cliffs'* that the Commission's rule was in fundamental conflict with the basic purpose of the Act. NEPA mandates a case by case balancing judgment on the part of federal agencies. In each individual case, the particular economic and technical benefits of planned action must be assessed and then weighed against the environmental costs; alternatives must be considered that would effect the balance of values. The point of the individualized balancing analysis is to ensure that, with possible alterations, the optimally beneficial action is finally taken.

Furthermore, certification by another agency (here the Federal Water Pollution Control Agency) that its own environmental standards are satisfied involves an entirely different kind of judgment.

> Such agencies, without overall responsibility for the particular federal action in question, attend only to one aspect of the problem: the magnitude of certain environmental costs. They simply determine whether those costs exceed an allowable amount. Their certification does not mean that they found no environmental damage whatever. In fact, there may be significant environmental damage (*e. g.*, water pollution), but not quite enough to violate applicable (*e. g.*, water quality) standards. Certifying agencies do not attempt to weigh that damage against the opposing benefits. Thus the balancing analysis remains to be done. It may be that the environmental costs, though passing prescribed standards, are nonetheless great enough to outweigh the particular eco-

nomic and technical benefits involved in the planned action. *The only agency in a position to make such a judgment is the agency with overall responsibility for the proposed federal action—the agency to which NEPA is specifically directed.*[48]

The procedural requirement of the detailed statement is to ensure that this process occurs. Without it the Corps accepts by rote the determinations of other agencies. The Circuit Court succinctly stated:

> NEPA establishes environmental protection as an integral part of the Atomic Energy Commission's basic mandate. The primary responsibility for fulfilling that mandate lies with the Commission. Its responsibility is not simply to sit back, like an umpire, and resolve adversary contentions at the hearing stage. Rather, it must itself take the initiative of considering environmental values at every distinctive and comprehensive stage of the process beyond the staff's evaluation and recommendation.[49]

■ Congress has provided that the Corps of Engineers may consult with other agencies and states before deciding, but it provided, in Section 102(2)(C) only for full consultation, not an abdication to those other agencies or states. It certainly did not grant a license to disregard the main body of the NEPA obligations.[50] There are no specific statutory obligations that the Corps of Engineers has that prevents it from complying with the letter of the NEPA. Certainly, standards set by other agencies, in this case the Federal Water Pollution Control Agency, are to be recognized. Abdication to them, however, is not authorized. Obedience to water quality certifications under the Water Quality Improvement Act[51] is not mutually exclusive with the NEPA procedures. It does not preclude performance of the NEPA duties. Water quality certifica-

48. 449 F.2d 1109, 1123 (D.C.Cir. 1971).

49. 449 F.2d 1109, 1119 (D.C.Cir. 1971).

50. 42 U.S.C. Sections 4332(2) (C), 4334 (1971).

51. 33 U.S.C. Section 1171 (1971).

tions essentially establish a minimum condition for the granting of a license. But they need not end the matter. The Corps of Engineers can then go on to perform the very different operation of balancing the over-all benefits and costs of a particular proposed project, and consider alterations above and beyond the applicable water quality standards that would further reduce environmental damage. The Corps of Engineers may still conduct the NEPA balancing analysis consistent with the Water Quality Improvement Act and Section 104 of NEPA does not exempt it from doing so.[52] Therefore, the Corps must conduct the obligatory analysis under the prescribed procedures of NEPA.

▆▆▆▆ The Court in *Calvert Cliffs'* reviewed the section by section analysis of NEPA submitted to the Senate.[53] The Court concluded that this analysis clearly stated the overriding purpose of Section 104: that no agency may substitute the procedures outlined in the Act for more restrictive and specific procedures established by law governing its activities.[54] Moreover, this rather meager legislative history could not radically transform the purport of the plain words of Section 104.

> Had the Senate sponsors fully intended to allow a total abdication of NEPA responsibilities in water quality matters—rather than a supplementing of them by strict obedience to the specific standards of [the Water Quality Im-

provement Act]—the language of Section 104 could easily have been changed. * * * It is, after all, the plain language of the statute which all the members of both houses of Congress must approve or disapprove. The courts should not allow that language to be significantly undercut.[55]

Courts should interpret clear statutory wording to see that the overriding purpose behind the wording supports its plain meaning. NEPA did not permit the sort of total abdication of responsibility practiced by the Atomic Energy Commission in *Calvert Cliffs'*—it does not permit it here with the Corps of Engineers.

The Circuit Court for the District of Columbia held that NEPA contains very important procedural provisions. These provisions were designed to see that all Federal agencies do in fact exercise the substantive discretion given them. *"These provisions are not highly flexible. Indeed, they establish a strict standard of compliance."* (Emphasis added.) The regulations before the Court today clearly fly in the face of NEPA's mandate that *all* agencies of the Federal Government shall make such reports and include detailed statements as described.[56] There is no exception, as defendants have argued, carved out for those agencies that may be viewed as environmental improvement agencies.[57]

Plaintiffs' motion for summary judgment is granted.

---

52. 42 U.S.C. Section 4334 (1971). "Nothing in section 4332 or 4333 of this title shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with criteria or standards of environmental quality, (2) to coordinate or consult with any other Federal or State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency."

53. 449 F.2d 1109, 1126 (D.C.Cir., 1971).

54. *Id.*

55. *Id.*

56. 42 U.S.C. Section 4332(2) (C) (1971).

57. *Id. See Note*, N.Y.U.L.Rev. 304, 333–337 (1971) ; Rodgers, Industrial Water Pollution And The Refuse Act: A Second Chance For Water Quality, 119 U. of P.L.Rev. 761, 813–819 (1971). Even if there were an exception, the Corps of Engineers would be hard pressed to fit within the class as its reason for being speaks against such a classification.