**UNITED STATES of America**

v.

**ANACONDA WIRE & CABLE COMPANY, Defendant.**

**No. 71-Cr. 1020.**

United States District Court,
S. D. New York.

May 22, 1972.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, for the United States, by Ross Sandler, Asst. U. S. Atty.

William B. Rozell, New York City, for claimant Hudson River Fishermen's Ass'n.

CROAKE, District Judge.

## OPINION

On September 8, 1971, the Anaconda Wire and Cable Company was indicted in this district for 100 counts of discharging refuse into the navigable waters of the United States, in violation of 33 U.S.C. §§ 407 and 411, §§ 13 and 16 of the Rivers and Harbors Act of 1899, also called the Refuse Act of 1899 (March 3, 1899, c. 425, §§ 13, 16, 30 Stat. 1152, 1153) ("The Refuse Act"). At the arraignment, on September 27, 1971, the defendant pleaded guilty as charged to all 100 counts. The sentence, imposed by the undersigned on November 12, 1971 was a fine of $2,000 on each of 100 counts, for a total fine of $200,000.

Thereafter, the claimant, Hudson River Fishermen's Association ("HRFA"), notified the United States Attorney that it was claiming entitlement to a statutory reward for information given leading to the conviction. The United States Attorney thereupon sought an order from the undersigned fixing an award to HRFA; the propriety of this procedure has not been challenged. *See* Miller v. United Sates, 455 F.2d 833, 836 (4th Cir. 1971); *cf.* Connecticut Action Now, Inc. v. Roberts Plating Co., Inc., 457 F.2d 81 (2d Cir. 1972); *But see* United States v. Transit Mix Concrete Corp., Docket No. 70 Cr. 844, 2 E.R.C. 1074 (S.D.N.Y. December 11, 1970),

Shipman v. United States, 309 F.Supp. 441 (E.D.Va.1970). The motion was argued, and an opportunity to present testimonial or other evidence afforded, on March 22, 1972; after argument, decision was reserved.

In its answering papers, HRFA sought one-half of the entire fine, or $100,000. However, at the hearing, the claim was pressed only as to $25,000; in return, the United States refrained from contesting the value of the information submitted to it by HRFA. The $25,000 figure apparently represents a compromise between the $40,000 initial evaluation by HRFA of the worth of its information, and the initial $10,000 evaluation by the United States.

However, this agreement is hardly equivalent to a stipulated settlement which, after purely formal judicial approval, will resolve all issues. Several substantial questions remain for resolution by the Court. The first concerns the determination of the proper statutory role of the Court in passing upon any claim to an informer's reward. After the nature of that judicial function is defined, HRFA's activities must be evaluated. Finally, if an award is determined to be mandated or appropriate, a dollar figure must be arrived at. The $25,000 agreement would be relevant only to the last question, and would not necessarily be binding even there.

I

33 U.S.C. § 411 states in applicable part:

"Every person and every corporation that shall violate . . . the provisions of section[s] 407 . . . shall be guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding $2,500 nor less than $500, or by imprisonment (in the case of a natural person) for not less than thirty days nor more than one year, or by both such fine and imprisonment, *in the discretion of the court,* one-half of said fine to be paid to the person or persons giving

information which shall lead to conviction." (Emphasis supplied.)

The italicized language, punctuated as it is, is notably ambiguous. *Compare* the punctuation of 33 U.S.C. §§ 406 and 410. It speaks of "discretion" in a manner which could relate either to the anterior penalty provisions or to the posterior informer's reward provisions. Of the various reported cases applying this section, apparently only three have actually discussed to which provisions the discretion applies. In only one of these cases, albeit in this district, was the discretion found to refer to the court's determination of whether an applicant was entitled to a reward. United States v. Transit Mix Concrete Corp., *supra.* Even in that case, the court determined that, once the discretion was exercised in favor of granting a reward, there would be no discretion as to its amount, which would necessarily be one-half of whatever fine was imposed.

In the other two cases, the discretion mentioned in the statute was determined to relate solely to the penalty provisions. Miller v. United States, *supra,* 455 F.2d at 835–836; United States v. St. Regis Paper Co., 328 F.Supp. 660, 664 (W.D. Wis.1971). However, *Miller* was concerned with procedural due process in the adjudication of the validity of the informer's claim. The scope of discretion was of interest to the appellate court primarily as it related to the scope of appellate review and, upon remand, to the proper trial procedure to be followed. (The procedure therein suggested was substantially followed in this case, as noted above.)

The *St. Regis* case is likewise distinguishable. The two claims involved therein were based on separate convictions of two defendants on one count each. The present action, charging one defendant with one hundred separate but related offenses, could well be materially different. It presents an additional issue: whether a claimant may qualify as an informer if he has presented information which could be said to have led to a conviction on one or more counts, but not to all one hundred counts of the actual conviction. In *St. Regis,* only one count was involved in each case in which the informer had participated.

■ It might be argued that, notwithstanding the contrary *dicta* in these cases, the italicized language in the statute actually grants discretion to set the amount of the informer's reward in any amount from one-half the fine imposed to nothing, even if the claimant is a proper informer under the statute, and irrespective of the number of counts in the indictment or information. The argument would be that any reading of the statute which would restrict the discretionary language to the fashioning of the penalty would make that language mere surplusage, since it is patent that federal district courts generally possess complete sentencing discretion. A contrary reading, interpreting the statute as granting discretion relating to approval of informers' rewards, would be alleged to be preferable in that it would give full effect to all the language in the statute.

In refutation of this argument, it should first be recalled that no court has yet seen fit to adopt this reasoning. In addition, the argument, flowing as it does solely from general rules of statutory construction, is relatively unpersuasive when juxtaposed with the apparent legislative intent to be garnered from actual reading of the applicable provisions of the Refuse Act itself.

The impression engendered by the Refuse Act, which is actually an edited codification of earlier statutes going back to 1886, United States v. Standard Oil Co., 384 U.S. 224, 226–230, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966), is one of conciseness, explicitness, and universality of application. To take one example, 33 U.S.C. § 407 states,

"It shall not be lawful to throw, discharge, or deposit . . . from . . . [any] floating craft *of any kind,* or from the shore . . . any refuse matter *of any kind or descrip-*

tion *whatever* other than [sewage]. . . ." (Emphasis supplied.)

The almost absolute prohibition contained therein is affected in one way or another by the potential permit system contained in a subsequent part of the section, *see* Executive Order 11574 (December 23, 1970); Kalur v. Resor, 335 F.Supp. 1 (D.D.C.1971), and by other sections of 33 U.S.C. Ch. 9, *cf. e. g.,* 33 U.S.C. § 401, but there is nothing which creates any exceptions other than the "sewage" exception, or enlarges it. *See* United States v. Republic Steel Corp., 362 U.S. 482, 487, 490–491, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960). The courts have likewise refused to create any new exceptions. United States v. Standard Oil Co., *supra,* 384 U.S. at 229, 86 S.Ct. 1427, 16 L.Ed.2d 492; United States v. Esso Standard Oil Co. of Puerto Rico, 375 F.2d 621, 623 (3rd Cir. 1967). *Cf.* Kalur v. Resor, *supra.* In short, this and other sections of the Refuse Act are presently considered as remedial rather than criminal statutes, notwithstanding the applicable criminal sanctions. United States v. Standard Oil Co., *supra,* 384 U.S. at 230; *cf.* 230–231, 86 S.Ct. 1427, 16 L.Ed.2d 492 (dissent). The Act was drafted, "in language that approaches a Biblical commandment," as an enforcement mechanism, with the criminal sanctions merely lending teeth to the over-all anti-pollution mandate. Sandler, The Refuse Act of 1899: Key to Clean Water, 58 A.B.A.J. 468 (May 1972).

The key to an accurate analysis of the Refuse Act, then, is recognition of its straightforwardness. It is therefore most likely that the language italicized in above-quoted passage from § 411 was inserted to make explicit what is today taken for granted: namely, that a court may in its discretion impose any authorized fine, or imprisonment for any authorized term, or both.

This conclusion is buttressed by comparison of the language of § 411 with parallel grammatical constructions and phraseology in comparable sections of the Refuse Act. Specifically, both 33 U.S.C. §§ 406 and 410, not themselves involved herein, provide for fines or imprisonment similar to those provided by § 411, and these provisions are also followed by the phrase, "in the discretion of the court." However, neither of those sections contains any provision for informers' rewards, so the discretion granted therein necessarily refers to discretion in fixing the penalties upon conviction.

The only difference between §§ 406 and 410, on the one hand, and § 411 on the other, is the last clause of § 411 establishing an informer's reward. Section 411 is thus comprised of two units: the penalty provision, similar to those in §§ 406 and 410, and the informer provision. The "discretion of the court" is clearly a part of the first unit; it most likely refers solely to the penalty provision contained therein. *Cf.* Kalur v. Resor, *supra,* 335 F.Supp. at 10–11.

The statutory language establishing an informer's reward in certain circumstances must therefore be read to create an affirmative right in the informer to the reward; there is nothing in the statute which would permit a discretionary refusal to withhold the reward altogether from a qualified informer. What is necessary in order for an informer to "qualify," and the amount of the reward, are separate matters.

II

As was noted above, we have discovered only one case discussing the question of the amount of a reward to an informer whose activities led to a multi-count conviction. In that case, also involving 100 counts, the court awarded an informer's fee of $12,500, one-half of the aggregate of the $500 fine imposed on each of the first 50 counts. On the last 50 counts, imposition of sentence had been suspended, and the defendant placed on probation. United States v. Transit Mix Concrete Corp., *supra.*

However, the informant in that case had clearly earned the full $12,500 awarded: she had made the complaint

which initiated the Government's investigation, testified before the Grand Jury, and produced logs and photographs showing repeated specific violations of the Refuse Act. Since $12,500 was a fair reward, the Court was not compelled to determine whether a reward in a lesser amount was possible; nor, for that matter, whether any rights to an additional amount accrued by reason of the suspended imposition of sentence on the last 50 counts, in case of a subsequent violation of probation or other action which could result in an additional penalty.

The activities of the present claimant are extensive, but not as overwhelming as those of the informer in *Transit Mix*. HRFA was only one of several private or public organizations policing the defendant's activities. Its actions, while significant from a prosecutorial point of view, were because of the nature of the discharge less productive of competent trial evidence. The possibility of a reward in an amount less than the maximum is therefore a relevant consideration in the present circumstances, and apparently a question of first impression.

■ It is our opinion that 33 U.S.C. § 411 does authorize or permit an award of an informer's reward in an amount less than the total fine in cases involving multi-count convictions. At a minimum, the reward may be set at an amount equal to one-half the total fine imposed on any specific number of counts, irrespective of the fine imposed on other counts. We base this conclusion on our comprehension of the policy behind the Refuse Act and our appreciation of the proper methodology for advancing that policy within the confines of the statute.

■■ It is difficult to glean support either for or against our interpretation from the language of the statute itself. For that matter, in single-count situations, it is more or less established that there is no discretion to withhold part of an earned reward. *See* Part I of this

opinion, *supra*. On the other hand, it is apparent that the statute, with its antecedents almost a century old, was drafted without any consideration of the possibility of the modern phenomenon of the multi-count indictment as it is used in the anti-pollution area. This concept not having been called to the draftsmen's attention, a cramped construction blindly applying the language of the statute to an unanticipated situation should be avoided if possible. United States v. Republic Steel Corp., *supra*.

The growth of the multi-count indictment under the Refuse Act has coincided with the rise of the modern corporation as the dominant commercial unit, with its access to huge economic resources, and the concomitant necessity for increasing the penalty for unlawful pollution in order to preserve the deterrent viability of the sanctions in the Act. In addition, if it be assumed that the technological advances associated with these corporations have resulted in possible unlawful discharges of novel volume, toxicity, and permanence of effect, larger fines would be required to offset the greater costs of repair of the damages.

The theory advanced by the prosecutors and accepted by the courts in justification for these multi-count indictments appears to be that,

> "if a plant has one shift a day and the polluting discharge virtually stops with the ending of that shift, each day becomes a separate count."

Sandler, *supra*, 58 A.B.A.J. at .470. The number of counts, then, initially reflects a prosecutorial decision concerning the severity of the sanction required to deter the particular defendant from continuing its allegedly unlawful conduct. The courts reserve their sentencing discretion not only through varying the amount of the fine on each count, but also by suspending sentence on all or any number of counts.

The entire development of the form of the indictment has been motivated by matters irrelevant to the determination of the amount of the informer's reward.

The reward is presumptively designed to encourage citizens to come forward with evidence of polluting activities; the size of the reward should reflect the time spent and expense incurred by the informer in gathering his information, its value to and effect on the Government, and the amount of encouragement considered appropriate to induce other potential informants to come forward with similar information. To read the statute as establishing an inflexible "one-half or nothing" rule would be to make the amount of the reward dependent, not on the above factors, but on the fortuity of the economic status of the particular convicted defendant.

It is true that the amount of the informer's reward does not affect the size of the fine payable upon conviction, and that the convicted defendant remains in the same position whether his money is retained by the Government or paid out in part to an informer. However, courts and federal prosecutors are traditionally reluctant to permit windfalls at the public expense, particularly where the diversion from the public funds could be considered a reduction in monies potentially available to repair the damages caused by the unlawful discharges. A reward totally beyond anything which could be related to the activity of the informer or the need for encouragement of others would be such a windfall. Were the statute read as mandating a windfall in a particular case, the only means for avoiding it would be by awarding no reward at all, were that possible, or by imposing a smaller fine. A smaller fine, in turn, could be achieved either by the Government's seeking an indictment or information charging a lesser number of counts, or by the imposition of a smaller fine on each count.

■ Thus, to read the statute in an inflexible "one-half or nothing" manner might actually produce, not more informers and the fear of them by potential defendants, but an impairment of the deterrent effect of the informer provision through restrictions on the court's ability to impose adequate fines, either because of previous prosecutorial judgments or because the court in a particular case was more concerned with preventing windfalls at the public expense than in imposing severe sanctions. Of course, the United States Attorneys and the District Courts are capable of balancing these conflicting interests, but it would be preferable to interpret the statute, if possible, so as to eliminate the difficulty altogether. The statute is remedial in essence if not in form, and is to be interpreted wherever possible to preserve its efficacy.

Another problem with an inflexible reading of the statute is that it might preclude duplicate rewards in a given case to two informers, each of whom had independently provided information leading to the conviction of a particular defendant. It might also preclude a single reward if another informer had also provided information in the case without having sought any reward, either out of altruism, or because· it was a public agency and therefore ineligible as not being a "person" within the meaning of the statute. We have not discovered any reported occurrence of either of these situations, but the theoretical difficulty is not to be dismissed.

The only response possible to these policy considerations is the assertion of the "plain meaning" of the Refuse Act. However, we find that the statutory language is by no means clear on its face, and that all relevant policy arguments support the interpretation of the statute which preserves its flexibility. *Compare* Kalur v. Resor, *supra,* 335 F.Supp. at 11.

■ In other words, we find that, notwithstanding the fact that the language, "in the discretion of the court," does not refer to the informer's reward provision, the nature of the judicial function in setting the reward, and the evident purpose of the statutory scheme, mandate the exercise of what is actually a form of discretion. It is not the discretion to withhold an earned reward, but rather that to allow such a reward as would be appropriate in the totality of the circumstances.

Whether the final reward be arrived at through a single award, or through the aggregation of separate rewards of one-half the fine imposed on particular counts, with no reward on the other counts, should not be significant in light of our interpretation of purpose and intent of the statute. However, should the statute be construed to mandate an award of a reward of one-half the fine, the total reward might still be restricted to an amount deemed appropriate through a finding that the information provided by the claimant "led" to "conviction" only on specified counts.

### III

 It seems apparent that the claimant to an informer's reward under 33 U.S.C. § 411 should not be required to convince the court that he was the sole or initial source of the information necessary and sufficient for the conviction. To impose that burden would be to require the claimant to establish which factors influenced the United States Attorney in his decision to commence and continue a prosecution. Not only would this question involve the difficult proof of what was the governmental "state of mind," but it would also put claimant to proof of confidential matters wholly within the Government's control. *See generally* Frankel v. S.E.C., 460 F.2d 813 (2d Cir. 1972). Rather than inquire into the propriety of prosecutorial motivation, the drafters of the Constitution thought it preferable to insulate defendants from improper motivation through the mechanism of an independent grand jury with sole power to indict. *See* the Fifth Amendment. The result is that the Government's motivation is generally legally irrelevant in all aspects of a criminal prosecution, including one under the Refuse Act. In fact, the grand jury characteristically develops a large portion of the eventual trial evidence in a Refuse Act prosecution through service of subpoenas duces tecum upon responsible officers of defendants which as corporations enjoy no Fifth Amendment testimonial privilege,

*see* Sandler, *supra*, 58 A.B.A.J. at 469. It may well be that particular indictments were motivated by displeasure with defendants' conduct before the grand jury. This motivation would be independent of anything done by an informer.

The preferable method for determining whether a claimant is entitled to an informer's reward would appear to be to require of the claimant proof only of collection and transmittal of information which could have provided an adequate basis for the decision to inititate a criminal investigation. Once this were established, the United States would then have to persuade the Court, should it choose to contest the reward, that the prosecution was independent of information provided by the claimant and uninfluenced by its activities; *i. e.*, that the claimant's information did not in fact "lead to conviction." Even when the propriety of a specific reward is not contested, the United States Attorney, as the representative of the Government from whom the reward would indirectly come, should substantiate the claimant's allegations in so far as the proof was in the Government's possession.

In the present action, it is undisputed that HRFA gave information to the Government, but the Government has characterized the information as "general [and] inexact" and has stated,

> "The HRFA in fact gave no factual information whatsoever on which a prosecution might be based. Its role was to encourage the United States Attorney to continue its investigation . . . the information that caused the initiation of the investigation came entirely from the Interstate Sanitation Commission, a governmental agency . . . ." (Government's Memorandum, at pp. 7–8.)

The Government also alleges that the specific findings which led to the indictment and subsequent plea of guilty were developed by the Army Corps of Engineers, as well as by the grand jury itself.

In response, the HRFA has submitted a memorandum and various extensive affidavits recounting the actions it has taken. Spatial limitations prevent an exhaustive catalog of HRFA's actions, but they did include the following. The organization was founded in 1966, and has been continually active thereafter in a campaign against pollution of the Hudson River, apparently concentrating its energies on the activities of the present defendant. Furthermore, the efforts relating to this defendant made by individual members of the organization, who include former long-term employees of the defendant and at least one author professionally engaged in monitoring the current environmental crusade, go back as far as 20 years.

HRFA members' affidavits are replete with references to specific oral or written reports made on stated occasions to named officials in various state and federal agencies, such as the New York State Department of Health (now that of Environmental Conservation), the Coast Guard, the Army Corps of Engineers, the Interstate Sanitation Commission, and including four different Assistant United States Attorneys in this district. The reports are partially corroborated by extrinsic evidence or the affidavit of the official to whom the report was made; where such corroboration is impossible, the reason has been stated.

These reports apparently included information on the specific sources and nature of various alleged discharges, and the methods of the discharge, including alleged cover-up practices. Diagrams of the physical layout of the plant, with emphasis upon the locations of the effluent pipes, were donated, and official inspectors were led to actual discharges. An apparent State Environmental Conservation determination at one time that the defendant had cured its effluent problem through installation of retention devices was apparently successfully challenged, initially by HRFA. Finally, HRFA attempted to alert other organizations and the general public, and solicited citizens' reports of pollution on forms which it developed and distributed.

The actual role of the claimant in inducing or procuring the present conviction might have been easier of determination had there been a full trial of the issue of defendant's guilt. But precisely because the evidence was irrefutable, the defendant did not contest it. However, there is sufficient before the Court to substantiate the conclusion of the office of the United States Attorney that the claimant has qualified as an informer. Its activities did unquestionably lead to conviction, not because it provided expert reports of detailed chemical analysis of particular effluents discharged on each or any of the days mentioned in the various counts of the indictment, nor even because it was the first to discover the fact of an unlawful discharge. Rather, HRFA persistently challenged the bureaucratic inertia which characteristically prevents effective governmental action on controversial matters. It must be considered to have played a causal role in the eventual galvanization of the responsible officials which led to the present conviction.

On the other hand, the informer was not the only organization presenting information to the United States Attorney's office, and was probably less qualified than others from a technical point of view to ascertain with sufficient reliability the precise unlawful nature of the discharges complained of. As noted above, four governmental agencies were in consultation both with HRFA, with each other, and with the office of the United States Attorney; they were also independently involved in the investigation of the defendant's activities.

On balance, after careful consideration of the facts, and with due regard for the self-evaluative capabilities of the parties underlying their agreement upon a reward in a particular amount, we nevertheless find that figure inappropriate. We find $20,000 to be a preferable amount. Accordingly, we will "apportion" the potential $100,000 re-

ward among the five "informers," HRFA and the above-listed public agencies or departments, and award HRFA one-fifth the total, for "causing" the conviction on the first 20 counts. This represents a figure which we consider equitable to all. The other four-fifths of the total will of course remain in the Government's coffers; we make no finding either that any organization other than HRFA is an "informer" or that, if it were, it would be entitled to any award.

Similarly, we intimate no opinion as to whether, had we been faced with a "one-half or nothing" decision, we would have awarded anything to any claimant.

Submit order.