GETTY OIL COMPANY (EASTERN OP-
ERATIONS), Inc., a Delaware cor-
poration, Plaintiff,

v.

William D. RUCKELSHAUS, as Adminis-
trator of the Environmental Protection
Agency, and the Environmental Protec-
tion Agency, Defendants.

Civ. A. No. 4366.

United States District Court,
D. Delaware.

May 10, 1972.

Supplemental Opinion May 10, 1972.

Charles F. Richards, Jr., Robert H. Richards, III, and David S. Swayze, of Richards, Layton & Finger, Wilmington, Del., for plaintiff.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., Daniel J. Snyder, Jacob Hart, Marc Suffern, of Environmental Protection Agency, Philadelphia, Pa., and Lee Stewart, Dept. of Justice, Washington, D. C., for defendants.

## OPINION

STAPLETON, District Judge.

This action seeks (1) preliminary and permanent orders staying the effect of a compliance date set forth in a compliance order issued by the Administrator of the Environmental Protection Agency (the "Administrator") pursuant to Section 113 of the federal Clean Air Act as

amended by the Air Quality Act of 1967 and the Clean Air Act amendments of 1970 (42 U.S.C. § 1857 et seq.) ("the Clean Air Act") and (2) a declaratory judgment that this compliance order is null and void. The case is currently before me on plaintiff's motion for a temporary restraining order. Except to the extent otherwise indicated below, the relevant facts are not in dispute.

Since 1956, plaintiff Getty Oil Company (Eastern Operations), Inc., ("Getty") and its predecessors in interest have operated a large oil refinery in Delaware City, New Castle County, Delaware. One of the products of this oil refinery is fluid petroleum coke. When operating at capacity, the refinery produces approximately 1,500 tons per day of this black, sand-like substance. Coke is a high energy fuel with heat generating characteristics. In order to make use of this fuel, Getty decided to utilize the coke to supply a large portion of the energy requirements of the refinery. Accordingly, a power station was constructed in conjunction with the refinery and designed to burn fluid coke along with either fuel gas or oil. This power station is operated by Delmarva Power & Light Company ("Delmarva"). Delmarva's power station burns the fluid coke under a long term contract with Getty and supplies all of the electricity and steam requirements needed to operate the refinery. The station also generates electricity for Delmarva's power grid at Delaware City.

In September of 1970 Delaware's Water and Air Resources Commission (the "Commission") noticed and held a public hearing on proposed air pollution regulations for the State of Delaware. Getty appeared at the hearing and argued against adoption of a proposed regulation which would have the effect of limiting the sulphur content in fuel burned at Delmarva's power plant to 3.5% after January 1, 1972. Thereafter, on October 13, 1970, the Commission adopted Regulation XV, Section 2.4 (the "Regulation") providing that "after January 1, 1972, fuel having a sulphur content greater than three and five-tenths percent (3.5%) by weight shall not be utilized in the area south of U.S. Route 40 in New Castle County for fuel burning equipment having a maximum rate of heat input equal to or greater than 500,000,000 b. t. u. per hour." Since the Delmarva power station is the only establishment having such equipment within the area specified, this regulation presently affects only that installation. Under a regulation simultaneously adopted, facilities with fuel burning equipment having a smaller rate of heat input were limited after January 1, 1972 to the burning of fuel having a sulphur content of 1% or less.

Section 3 of Regulation XV provided an alternative control. It specified that "the sulphur and fuel restrictions of Section 2 shall not apply in any case where it is demonstrated to the Department that the sulphur dioxide emission from any unit of fuel burning equipment will be controlled to sulphur dioxide levels equivalent to the sulphur dioxide emissions that would result by virtue of burning the applicable fuels listed in Section 2 as they apply."

Getty took no appeal to the Delaware state courts attacking the Commission's approval of these regulations on October 13, 1970.[1] They became part of Delaware's Implementation Plan for attainment and maintenance of the primary national standards for sulphur dioxide promulgated by the Administrator under the Clean Air Act. The sulphur dioxide portion of Delaware's Implementation Plan received federal approval on August 4, 1971. While this approval received substantial publicity at the time

---

1. Section 6012 of Title 7 of the Delaware Code provides that "any person whose interest is substantially affected by any action, order or decision of the Commission" may appeal to the Superior Court of the appropriate county which "shall hear and determine the matter as a suit in law and equity." 7 Del.C. § 6012 as amended effective July 23, 1970.

and presumably came to Getty's attention shortly after the action was taken, notice of the approval was not published in the Federal Register until February 3, 1972.

After the Commission's adoption of the regulation, Getty made an effort to find a technology which would permit compliance, before January 1, 1972, by meeting the terms of Section 3. The search revealed that there is no such technology presently available and that the most promising technologies presently being studied will not enable the Delaware City plant to comply by meeting the alternative control of Section 3 before 1976.

During the summer of 1971, Getty determined that, "since the quality of air in New Castle County, Delaware was very good and [already] met the national primary standard for sulphur dioxide," it should apply for "a variance" from the effect of the regulation pursuant to Delaware's air pollution control statute. 7 Del.C. § 6007. While the proposition is disputed, Getty had submitted competent expert testimony by way of affidavit that the available data collected by air monitoring stations during the last eleven years pertaining to the ambient air concentrations of sulphur dioxide in New Castle County, with one minor exception, show full compliance with the national primary standards for sulphur dioxide. Getty's expert further expresses the opinion, currently uncontradicted in the record, that "there exists no danger whatsoever to the public health from the existing levels of sulphur dioxide in the ambient air in New Castle County, Delaware."

On September 28, 1971, Getty applied for a variance with the Secretary of the Department of National Resources and Environmental Control of the State of Delaware (hereafter the "Secretary" and the "Department", respectively). On December 28, 1971, the Secretary denied Getty's application. He determined that if the variance were granted compliance with the national sulphur dioxide primary standard would be achieved no

earlier than late 1975 or early 1976 and that the granting of the variance was precluded by the federal statute and regulations. He denied "a stay" pending an appeal of his decision to the Commission as provided by Delaware law. 7 Del.C. § 6008. Getty's appeal is currently pending before that body.

Having unsuccessfully applied to both the Department and Commission for a stay of the effect of the regulation, Getty instituted an action against the Secretary in the Court of Chancery in and for New Castle County on December 29, 1971. That court entered a temporary restraining order restraining enforcement of the regulation by the Secretary and the Commission "until further order of the court." This temporary restraining order is still in effect. While there has been no formal disposition of Getty's motion for a preliminary injunction, the Vice Chancellor has recently denied an application of the Secretary to vacate the restraining order.

Since approval by the Environmental Protection Agency ("EPA") of Delaware's Implementation Plan no petitions for review of the Administrator's action have been filed pursuant to Section 307 (b) (1) of the Clean Air Act by Delmarva, Getty or any other party.

On February 14, 1972, the EPA sent a certified letter pursuant to Section 114 (a) of the Act to Delmarva. The letter requested information dealing with the sulphur content of fuel burned by Delmarva at its Delaware City plant. The data provided in response revealed that the total content of sulphur by weight exceeded 3.5% during the month of January. Updated information thereafter submitted by Delmarva demonstrated that the same situation existed in February and March of 1972. On the basis of Delmarva's admissions, the Administrator of the EPA, pursuant to Section 113(a) (1) of the Clean Air Act, determined that a requirement of an applicable implementation plan had been violated. The Administrator notified Delmarva of this violation by registered letter dated March 6, 1972. A conference

was held on March 20, 1972. On the basis of admissions then made by Delmarva, together with Delmarva's continuing submissions under Section 114(a)(1), it was determined that a violation of the regulation did exist, and that said violation has continued beyond the thirtieth day after the date of the Administrator's March 6, 1972 letter. On April 17, 1972 the Administrator, pursuant to Section 113(a)(1) of the Act, issued the order which is the subject of this proceeding directing compliance by May 1, 1972. This suit ws filed on April 21, 1972 and a hearing on Getty's application for a temporary restraining order was held on April 27, 1972. Thereafter, the Administrator voluntarily agreed to suspend the effectiveness of the compliance date until May 10, 1972 in order to allow the Court more time to consider the issues briefed and argued by the parties.

Delmarva joined in Getty's application for a variance. While it is not a party here, an affidavit of its chief executive officer has been filed stating that Delmarva intends to comply with the Administrator's order "unless relieved of compliance by an order of this Court pursuant to the application of Getty Eastern, and will not run the risk of incurring criminal fines and jail sentences which might be imposed if it did not comply." According to the Delmarva affidavit "substantially all of the increased cost resulting from the requirement . . . that Delmarva Power & Light Company burn fuel at its Delaware City power station having a sulphur content by weight of no more than 3.5% will be passed on by Delmarva Power & Light Company to its public customers and Getty Eastern." Getty's share of the increased cost will amount to approximately $10,000 per day.

When analyzing the respective arguments of the parties with respect to jurisdiction, it is necessary to keep in mind the grounds which Getty asserts as a basis for affirmative relief. Getty here attacks both the regulation and the Section 113 compliance order. While Getty expressly disavows any claim that the regulation is invalid as a "generally applicable regulation," Getty does allege that it is "arbitrary and unreasonable *in its application to plaintiff* and that its enforcement *as to plaintiff* [2] would be in violation of the requirements of the Fourteenth Amendment to the Constitution of the United States." This assertion is not further elaborated in the complaint. As I understand it, however, the arbitrariness and unreasonableness of the regulation result from the alleged facts (1) that the national primary standards for sulphur dioxide have already been achieved in New Castle County and the regulation is accordingly wholly unnecessary to achieve and maintain that standard, and (2) that compliance with the regulation at least prior to developments of an alternative control technology would impose an unreasonable hardship on Delmarva and Getty. In connection with this latter point Getty asserts that it has applied for a variance on the basis of this hardship and that enforcement of the regulation prior to a determination of its appeal from the Secretary's denial of a variance would deprive it of procedural due process.

With respect to the compliance order Getty claims that it is "unwarranted by the facts, arbitrary and capricious," and "otherwise unlawful." Its enforcement prior to a "due process hearing" in this Court would also, Getty claims, "constitute the taking as property without due process of law." Finally, Getty asserts that the compliance order is invalid because it was issued in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq.[3]

---

2. Emphasis supplied.

3. In order to keep the length of this opinion within reasonable limits, I have enumerated and hereafter discuss only Getty's principal arguments in support of the relief sought. I have considered Getty's other contentions and find them to be without merit. I deem it necessary to comment on only one. The compliance

The Administrator denies these propositions and further asserts (1) that Getty has no standing to raise them and (2) that this Court is without jurisdiction to pass upon them.

 I have concluded that plaintiff does have standing to bring this action[4] and that this Court has jurisdiction to pass upon the issues presented under 28 U.S.C. § 1337 and the Declaratory Judgment Act (28 U.S.C. § 2201), as well as under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. *unless, and except to the extent that,* the Clean Air Act precludes review.[5] Accordingly, I turn to that Act.

Section 110(a) (1) of the Clean Air Act provides that "each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within nine months after the promulgation of a national primary ambient air quality standard . . . a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State." If the Administrator determines that a state's implementation plan meets the requirements of the federal statute and has been adopted by the state after reasonable notice and public hearings, he must approve the plan within four months after submission. Section 307(b) of the Act provides in part as follows:

"(1) . . . A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 . . . may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval, or after such date if such petition is based solely on grounds arising after such 30th day.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."

 While there is some dispute about the effective date of the Administrator's approval, Getty maintains, with substantial justification, that it became effective on February 3, 1972 when notice thereof was first published in the Federal Register. Getty filed no review action under Section 307 within the allotted 30 days.[6] While paragraph (2) quoted above refers only to enforcement proceedings it clearly evidences a congressional intent that matters which can

order was not issued in violation of the temporary restraining order of the Court of Chancery because the Administrator was not a party in the Chancery action and neither was nor could be included in its scope. Chase National Bank v. City of Norwalk, 291 U.S. 431, 436, 54 S.Ct. 475, 78 L.Ed. 894 (1934); Alemite Mfg. Corp. v. Staff, 42 F.2d 832 (2nd Cir. 1930).

4. Delmarva would have standing. Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). While the standing of Getty presents a more debatable question, I find that its position and economic stake are such as to meet the applicable criteria under the more recent Supreme Court cases. See Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 decided April 19, 1972; Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970).

It is undisputed that Getty will bear an economic burden of $10,000 per day through increased rates for its energy requirements. For this reason, Getty is in a position similar to the parties found to be "aggrieved" by administrative action in Lynchburg Gas Company v. Federal Power Commission, 119 U.S.App.D.C. 23, 336 F.2d 942 (1964) and United States v. Public Utilities Commission, 80 U.S. App.D.C. 227, 151 F.2d 609 (1945). See also Davis, Administrative Law, § 22.12. With respect to Getty's standing to raise its NEPA argument see National Helium v. Morton, 455 F.2d 650 (10th Cir. 1971).

5. General Motors Corporation v. Volpe, 321 F.Supp. 1112 (D.Del.1970), modified, 457 F.2d 922 (3rd Cir. 1972).

6. None of the facts relied upon by Getty in its present attack upon the regulation occurred after the thirtieth day.

be raised in a Section 307 review proceeding shall not be litigated elsewhere. Accordingly, this Court cannot review any question which Getty could have raised in such a proceeding.

It seems clear that judicial determination of an attack on the validity of a compliance order not based upon the invalidity of the underlying regulation is not expressly precluded by Section 307. On the other hand, it would appear that attacks upon the Administrator's approval of a regulation are precluded if not asserted in a Section 307 review proceeding. Getty acknowledges that this is true as to attacks upon a regulation as "invalid on its face" or as unlawful as a "generally applicable regulation," but asserts that it is not true with respect to an allegation of an affected party that the regulation is "invalid as applied to him." If there is any merit to this distinction, I do not think that it can apply quite so broadly as Getty suggests.

The text of the last sentence of Section 307(b) (1) makes it clear that Congress did not intend to limit Section 307 review to cases where the Administrator's approval of a regulation is challenged on grounds that the procedure followed did not comply with the statute, that the Administrator exceeded his statutory authority, or that the regulation is otherwise void on its face. Such grounds would always exist upon the date of the

approval and the last clause contemplating grounds arising after 30 days would have no conceivable application.[7]

Moreover, a party must have standing to secure judicial review and in a very real sense any challenge to the validity of a regulation is a challenge to the regulation as applied to the objecting party. In the instant case, Getty's argument that the regulation is wholly unnecessary because the national primary standard has already been achieved in New Castle County is a contention which anyone affected by the regulation could raise and is not personal to Getty in any way. Nor does Getty's "arbitrary and unreasonable" argument change its basic character when Getty adds that along with being unnecessary the regulation is also very costly. Getty could have argued at the hearing and on review under Section 307 that the economic burdens imposed by the regulation when compared to environmental benefits render the regulation wholly arbitrary.[8] Congress intended to have such challenges disposed of as soon as possible after the Administrator's approval. Having failed to avail itself of the opportunity provided, Getty cannot now complain.[9]

Section 307(b) (1) appears to be an adaptation of a technique previously used by Congress in other regulatory schemes. The National Traffic and Motor Vehicle Safety Act, 15 U.S.C. § 1381 et seq., for

7. This concluding clause is not explainable as being applicable to an Administrator's approval of revisions of an implementation plan. They either come within the phrase "Administrator's approval of an implementation plan" or they do not. If they do, approval commences a fresh 30 day period under Section 307(b) (1). If they do not that section is inapplicable. In neither event is the presence of the concluding clause explained.

8. The cost to Delmarva and Getty would, of course have been relevant evidence of the economic burdens which the regulation would impose. Indeed, on the facts of this case, the cost to Delmarva and Getty was the only economic burden which would be imposed, at least initially.

9. Getty argues that the Court of Appeals would surely have refused to decide its

contention because Getty and Delmarva had not exhausted the possibility of a variance. I am unpersuaded. Congress did not require a variance procedure in the Clean Air Act beyond that provided for in Section 110. It is unlikely that it enacted Section 307 with the idea that challenges to a regulation as "generally applicable" would be taken care of by Section 307 but that challenges to a regulation as specifically applied would be relegated a procedure which might or might not be included in the regulations. Moreover, it is unlikely that a court would relegate a party to a variance procedure when, as I have hereafter indicated, any variance if granted by Delaware would not become effective under the federal regulations until approved by the Administrator, thereby exposing Getty to allegedly irreparable injury in the interim.

example, provides for circuit court review, within sixty days, of an order establishing federal motor vehicle standards. 15 U.S.C. § 1394. Circuit court review proceedings under that act have been considered appropriate vehicles for raising arguments that an approved standard is arbitrary and unreasonable because unnecessary, uneconomic and ill-suited to the accomplishment of the objectives of the regulatory program. See Automotive Parts & Accessories Association v. Boyd, 132 U.S.App.D.C. 200, 407 F.2d 330 (1968). See also American Bond & Mortgage Co. v. United States, 52 F.2d 318 (7th Cir. 1931) (holding that a constitutional attack on an administrative ruling under the Federal Radio Act, as applied to plaintiff should have been raised in a Court of Appeal review proceeding provided for in the Act.[10]

█ The next question is whether the Clean Air Act as a whole, by necessary implication, forecloses pre-enforcement review of issues which could not be raised in a Section 307 review proceeding. We start with the proposition relied upon in Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 8 L.Ed.2d 681 (1967) that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." I conclude that no such contrary legislative intent is here evident, that the question presented is analogous to that presented in the *Abbott Laboratories* case, and that this Court has jurisdiction to entertain non-Section 307 issues raised in a pre-enforcement proceeding.

The text of the Clean Air Act provides no clear indication of an intention to preclude pre-enforcement judicial review. The fact that the Act specifies special judicial review procedures for some issues arising under the Act and not for others does not by itself evidence a legislative intent or preclude review of issues falling in the latter category. Abbott Laboratories v. Gardner, *supra*, at p. 141, 87 S.Ct. 1507.[11] Nor does the legislative history provide the necessary clear evidence.[12]

While there is no dispute in this case that Delmarva is burning fuel with a sulphur content higher than 3.5%, I believe the appropriate perspective from which to decide whether pre-enforcement jurisdiction exists is a case where there is a honest difference of view as to whether a particular establishment is or is not in compliance with an applicable

---

10. It is true that the Clean Air Act differs from the Motor Vehicles Safety Act and, indeed, in some respects from any other federal regulatory scheme the Court has been able to find and examine. Unlike the Safety Act, it is a cooperative state-federal program and hearings on state implementation plans are held before the Administrator only when the state has not conducted one. Apparently, the Administrator's information resources are ordinarily limited to the record of the state hearing (40 C.F.R. § 51.4(c)), and the data gathered by his agency. Moreover, unlike the Safety Act, "a concise general statement of [the rules] basis and purpose" is not required. Concededly if this Court's view of the congressional intent is correct, the character of the proceedings in a court of appeals' review in a case of this character under Section 307 (a subject to which the Clean Air Act does not speak) may be somewhat different from a court of appeals review under other existing regulatory programs. I am bound to assume, however, that Section 307 review will be implemented in a manner consistent with due process, and Getty, not having pursued the statutory remedy, cannot maintain otherwise. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

11. Arguably, one could perhaps infer from the fact that Section 307(b) (2) refers only to enforcement actions that Congress had in mind only two types of judicial proceedings, Section 307 review proceedings and enforcement actions. I consider this inference too speculative, however, to override the policy behind the *Abbott Laboratories* presumption.

12. I have carefully considered the numerous government references to the legislative history of the 1970 amendments and find each of them either inapplicable as a comment on proposals not actually enacted into law or as inconclusive evidence of congressional intent.

regulation. The government concedes that cases of this character are likely to arise. In such a situation compliance may seriously disrupt a business and impose a heavy economic burden; non-compliance will run the risk of cumulative fines of up to $25,000 per day as well as imprisonment. From this perspective I think it apparent that the courts should not readily imply a congressional intent to preclude pre-enforcement judicial review. I decline to do so.[13]

As in *Abbott Laboratories,* jurisdiction for pre-enforcement review under the Clean Air Act will not delay or impede effective enforcement of the Act. In addition to the other reasons cited in the *Abbott* case, the institution of this type of action does not by itself stay the effectiveness of the challenged order. If application is made for a stay, the government can oppose it by showing that delay would be detrimental to the public health or that one of the traditional prerequisites of preliminary injunctive relief is absent.

A court, having determined that it has pre-enforcement review jurisdiction, must then decide whether it should exercise its discretion in favor of entertaining the case. General Motors Corporation v. Volpe, 457 F.2d 922 (3rd Cir. 1972). As the Supreme Court observed in *Abbott Laboratories, supra,* 387 U.S. at pp. 148–149, 87 S.Ct. at p. 1515:

". . . The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy 'ripe' for judicial resolution. . . . The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."

In terms of fitness of the issues for judicial decision and hardship to the parties, I find this case indistinguishable from the *Abbott* case. The economic impact of compliance and the cumulative daily fines for non-compliance distinguish this case from General Motors Corporation v. Volpe, *supra.*

Accordingly, I turn to the question of whether Getty has presented an appropriate case for the issuance of preliminary relief. The availability of preliminary injunctive relief depends upon four criteria:

(1) Irreparable harm to the petitioner unless preliminary relief is granted;

(2) Absence of substantial harm to opposing party;

(3) Absence of harm to the public interest; and

(4) A likelihood that the petitioner will prevail on the merits of his case. Nelson v. Miller, 373 F.2d 474, 477 (3rd Cir. 1967).

It appears from the present record that there will be some irreparable economic injury to Getty if preliminary relief is denied. The Administrator's interest is synonymous with that of the public. The only evidence of record indicates that there would be no hazard to the public health or safety from a stay of the compliance order pending disposition of this case. While the Administrator correctly points out that the Clean Air Act was adopted by Congress as a health measure and that Congress determined that compliance with the national primary standards is in the interest of public health, he has thus far tendered no evidence that non-compliance with

13. While Getty's position is different from that of a party like Delmarva which is subject to cumulating fines, Getty's case for pre-enforcement judicial review is stronger in one respect. Theoretically, Delmarva could fail to comply and test the validity of the compliance order in a criminal enforcement proceeding. Getty would not be a party to that proceeding, however, and would have no right to intervene. This type of proceeding, accordingly, may be Getty's sole vehicle for challenging the compliance order.

Regulation XV for the next several weeks by this particular source would jeopardize the public health.[14]

The scale is, therefore, weighted to some degree in Getty's favor as we reach a consideration of the likelihood of its success. I agree with Getty that where irreparable injury is shown and the question is in reality the likelihood of success before an administrative body on a technical issue within its administrative expertise, a court may properly grant preliminary relief without finding a probability of success. American Home Products Corporation v. Finch, 303 F.Supp. 448 (D.Del.1969). As I view this case, however, this principle is not here applicable.

As I have heretofore held, the perhaps difficult issues of the quality of the ambient air in New Castle County and the economic impact of Regulation XV are not properly before this Court. Moreover, there is no dispute whatever that Section 2.4 of Regulation XV is applicable to Delmarva and that Delmarva has been burning fuel which does not comply with its requirements. This leaves Getty on the merits with (1) the argument that due process and the Delaware statute require a stay pending determination of the variance appeal, (2) the argument that the Administrator's selection of May 1, 1972 as a compliance date was arbitrary and capricious, and (3) the argument that the compliance order violates the NEPA. For the reasons hereafter set forth, I consider the likelihood of Getty's success on any of these arguments very slim.

### 1. *The Variance Appeal And Due Process*

I conclude that the Clean Air Act and the regulations promulgated thereunder provide that no deferral of the applicability of a regulation to a particular source of emissions can be effective until approved by the Administrator, that this forecloses a "stay" of the effect of the regulation pending final determination of Getty's variance application, and that this result does not violate Getty's right to procedural due process.

In the terminology of the statute and regulations, Delaware's Regulation XV is a part of the compliance schedule incorporated in Delaware's Implementation Plan. It has received federal approval and violation thereof is a federal crime enforceable by the Administrator. The federal statute and regulations do contemplate deferrals of the application of such a regulation to a particular source, but only under carefully circumscribed conditions.

Subsection 51.15(d) of the regulations [15] provides as follows:

"Except as otherwise provided by Subpart C of this part, neither the State agency nor a local agency shall grant any variance of, or exception to, any compliance schedule included in an applicable plan if such variance or exception will prevent, or interfere with, attainment or maintenance of a national standard within the time(s) specified . . . [in the implementation plan]."

Getty maintains that the variance it has requested will not prevent, or interfere with, attainment or maintenance of a national standard because compliance has already been achieved in New Castle County. The Secretary in acting upon Getty's application determined that such a variance would prevent attainment of the national standard until late 1975 or early 1976, which would be later than

---

14. I do not here indicate that immediate effect on the public has anything whatsoever to do with the duty of a person to comply with a valid regulation adopted under the Clean Air Act. Congress clearly intended that lack of effect on ambient air from pollution of a particular source would not excuse a failure to comply. This is not an enforcement action, how-ever. It is a suit to enjoin allegedly invalid agency action and the issue now before the Court is whether that action should be stayed pending a judicial determination of its validity.

15. The regulations hereinafter referred to are found in Part 51 of Title 40 of the Code of Federal Regulations.

the date specified in the plan under any construction thereof.[16] For present purposes, I will assume, without deciding, that Getty's position here is factually correct.

Getty argues that the above-quoted regulation by negative implication indicates that no federal approval is required for a variance or exception which will not prevent attainment or maintenance of the national standard within the time specified. It argues with justification that attainment of the national standard is the Administrator's sole concern and that he is not concerned about state action having a lesser effect. While I agree with Getty's characterization of the Administrator's responsibility, I do not agree with its conclusion.

Subsection 51.15(d) must be read in the context of the regulations as a whole. Subpart C of the regulations deals with extensions. Section 51.32 thereof provides that deferrals up to not more than one year may be granted by the Administrator if requested by the Governor of the State even though the deferral may prevent attainment or maintenance of a national standard within the time specified in the plan. Subsection (f) of that section provides as follows:

"(f) A State's determination to defer the applicability of any portion(s) of the control strategy with respect to such source(s) will not necessitate a request for postponement under this section unless such deferral will prevent attainment or maintenance of a national standard within the time specified in such plan: *Provided, however,* That any such determination will be deemed a revision of an applicable plan under Section 51.6"

Subsection (d) of Section 51.6 provides:

"Any revision of rules and regulations and of compliance schedules shall be submitted to the Administrator in accordance with § 51.5 within 60 days following its adoption."

Section 51.8 provides:

"The Administrator shall approve any plan, or portion thereof, or any revision of such plan, or portion thereof, if he determines that it meets the requirements of the Act. Revisions of a plan, or any portion thereof, shall not be considered part of an applicable plan until such revisions have been approved by the Administrator in accordance with this part."

The fallacy in Getty's analysis of the regulations is that, while the Administrator's concern is whether the state's plan will meet the national standards, he has a vital interest, precisely because of that responsibility, in the determination of whether a particular deferral will have the effect of preventing attainment or maintenance of the national standard. For this reason, the regulations provide that any deferral of the application of a compliance schedule, whatever its effect, is deemed a revision of the plan which must be submitted to the Administrator for his consideration. Under Section 51.8 he is required to approve it if it will not prevent attainment of the national standards and required to disapprove it if it will have that effect unless it is requested by the Governor and the other conditions of Section 51.32(a) through (g) are met. The importance of the requirement of submission to the Administrator for his consideration is demonstrated by the very case, where there is substantial difference of opinion as to whether the variance requested by Getty will or will not prevent attainment of the national standard within the time specified.

In short, the Administrator is duty bound to enforce an approved implementation plan. Revisions of a plan, including any deferrals of an applicable compliance schedule, do not become a part of an applicable plan until approved by the Administrator. It

---

16. Getty maintains that the plan specified no date and that by operation of law the pertinent date is February 3, 1975.

follows that Delmarva is required by federal law to comply with Regulation XV unless and until a deferral is granted by the state and approved by the Administrator. To the extent, if any, that Section 6008 of Title 7 of the Delaware Code dealing with stays pending appeals to the Commission conflicts with this conclusion based on the federal statute and regulation it is of no effect.

Getty cites no authority for its contention that enforcement of the regulation prior to a determination of its variance application will deny it procedural due process and the court has found none. Under the statutory scheme Getty and Delmarva, as I have previously held, either had or now have an opportunity for judicial determination of the validity of the regulation itself. Accordingly, its enforcement clearly cannot deprive them of procedural due process. What they are now trying to do in the variance proceeding is to persuade the Commission that a better rule as applied to their situation would not require 3.5% until some later date. Getty and Delmarva may or may not be successful in this effort and the required further effort to persuade the Administrator that such a rule would not prevent attainment of the national standard within the pertinent time period. But the Constitution does not require that they be excused in the meanwhile from complying with the regulation.

## 2. *The May 1, 1972 Compliance Date.*

Section 113 of the Clean Air Act provides in part:

"(a) (1) Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of any requirement of an applicable implementation plan, the Administrator shall notify the person in violation of the plan and the State in which the plan applies of such finding. If such violation extends beyond the 30th day after the date of the Administrator's notification, the Admin-

istrator may issue an order requiring such person to comply with the requirements of such plan or he may bring a civil action in accordance with subsection (b).

. . . . . .

(4) An order issued under this subsection (other than an order relating to a violation of section 112) shall not take effect until the person to whom it is issued has had an opportunity to confer with the Administrator concerning the alleged violation. A copy of any order issued under this subsection shall be sent to the State air pollution control agency of any State in which the violation occurs. Any order issued under this subsection shall state with reasonable specificity the nature of the violation, specify a time for compliance which the Administrator determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements.
. . . ."

Subsections (b) and (c) of Section 113 as adopted in 1970 provided for the institution of a civil or a criminal action when a person has failed to comply with a compliance order within the time stated. These sections were amended in 1971, however, to also provide for the institution of such proceedings if a violation extends beyond the thirtieth day after the Administrator's notification.

As previously indicated, Getty asserts that the compliance order was arbitrary and unreasonable. In light of the conclusions which I have heretofore reached, the only remaining basis for such an argument is that the Administrator's determination of a compliance date was an abuse of discretion. The government contends that resolution of this issue is wholly unnecessary because the 1971 amendments to the Clean Air Act eliminates the procedure described in Subsection (a) (4) as a prerequisite to enforcement actions. I shall assume for present purposes, however, that the Administrator, having elected to proceed via the

compliance order route, is now bound by his election.[17]

It is undisputed that low sulphur fuel is available and that, at the time of the issuance of the order, compliance by May 1, 1972 was feasible. Getty does not suggest that compliance with the regulation on May 1, 1972 would impose any greater or different burden upon it than compliance three months from now. Its arguments that the May 1, 1972 date was arbitrary and unreasonable would apply to any date prior to the availability of alternative control technology. According to its best estimates this will probably be 1976. This is obviously not the type of consideration which Congress meant the Administrator to consider in setting a compliance date under Section 113(b) (4). Getty's argument here is in reality an attack on the regulation itself. Section 113 is simply not an appropriate vehicle under the statute scheme for attacking a regulation or securing a variance. If reviewable at all, the determination by the Administrator of a compliance date under Section 113(b) (4) is reviewable only for an abuse of discretion. Getty has come forward with no fact which would indicate that he abused his discretion in this instance.

### 3. *The Applicability of NEPA.*

Getty argues that enforcement of the compliance order should be stayed because of the EPA's failure to file an environmental impact statements under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 et seq. (Supp. 1972). Section 102(2) (C) of NEPA, 42 U.S.C. § 4332(2) (C) provides:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

. . . . . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the pro-

---

17. The Court has found no legislative history concerning the 1971 amendments. They are somewhat puzzling. Subsection (a) (4), in the context of the 1970 Act, seemed to clearly indicate a congressional intent that there be a conference and a compliance date set before the criminal penalties would begin to accrue and before enforcement actions could be instituted. The 1971 amendments do not delete this subsection but do appear to emasculate it.

posal through the existing agency review processes;"

It is conceded that no impact statement was filed in connection with the issuance of the compliance order.

 Apart from legislative recommendations, Section 102(2) (C) is only applicable to *"major Federal actions* significantly affecting the quality of the human environment." (Emphasis supplied). Therefore, whether the EPA was bound to file an impact statement depends upon whether or not the compliance order was a major action affecting the environment within the meaning of the NEPA. See Scherr v. Volpe, 336 F.Supp. 886 (D.Wis.1971). Getty argues that issuance of the compliance order was the type of federal action requiring an impact statement because it results in inefficient utilization of natural resources and creates an environmental problem by requiring disposal of substantial quantities of coke. Here, once again, Getty misinterprets the nature and scope of a decision to issue a compliance order under Section 113.[18]

 I assume for present purposes, contrary to the Administrator's contention, that the NEPA applies to the EPA.[19] I further assume without deciding that the Administrator's approval of Delaware's Implementation Plan, including Regulation XV, was major action affecting the environment within the meaning of the NEPA. If so, any attack on that approval based on the failure of the Administrator to issue an impact statement prior to his approval

would be a matter with respect to which review could have been obtained under Section 307 of the Clean Air Act and cannot now be pressed before this Court.

 The purpose of the NEPA is to require federal agencies to consider environmental preservation in their respective spheres of responsibility and, to this end, it prescribes certain procedural measures to ensure that such consideration will in fact be given. Calvert Cliffs' Coordinating Committee v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); Kalur v. Resor, 335 F.Supp. 1 (D.D.C. 1971). The procedures specified clearly indicate that Congress intended such consideration when an agency was in the process of exercising its discretion between two or more alternatives open to it under the controlling law. The impact statement must specify such alternatives.

Here the applicable law provided that no one in Delmarva's position could burn fuel after January 1, 1972 which had a sulphur content by weight in excess of 3.5%. When the compliance order was issued the Administrator had no discretion, absent a lawful revision of the Delaware Plan pursuant to the prescribed procedure, to recognize any other rule of law. To be sure, he had discretion whether to institute enforcement proceedings and, within reasonable limits, when to insist upon compliance. In effect, he had prosecutorial discretion, but no discretion to amend or grant a variance to the law.[20] In such a context, to

---

18. The Administrator's argument that the 1971 amendment to Section 113 renders the issuance of a compliance order unnecessary as a prerequisite to civil or criminal enforcement proceeding and, therefore, irrelevance does not completely answer Getty's argument here. Getty could make the same argument, if necessary, about the issuance of the notice under Section 113(a) which is still a prerequisite to enforcement. The following comments in the text of this opinion, however, would apply equally to the issuance of such a notice.

19. Kalur v. Resor, 335 F.Supp. 1 (D.D.C. 1971) supports Getty's position on this point.

20. The *Kalur* case, relied upon most heavily by Getty, is distinguishable on this ground. The court there held that water quality certifications of the EPA establish a minimum condition for the granting of a permit by the Corps of Engineers under Section 13 of the Rivers and Harbors Act to dispose of industrial refuse in navigable waters. The Corps of Engineers was found to have discretion, above that minimum base, to decide whether the granting

require the interagency consultation and impact statement stipulated by the NEPA would seriously and unnecessarily impede effective enforcement of the Clean Air Act and similar federal regulatory programs. I conclude that Congress did not intend this result.

■ Having weighed the relevant criteria, I conclude that under traditional principles of equity this is an inappropriate case for issuance of a temporary restraining order.

Only one further issue remains. This Court's denial of a temporary restraining order will result in the enforcement of the compliance order prior to a final judicial determination of the merits of Getty's attack on that order. Citing the cumulative penalties for a failure to obey a compliance order, Getty argues that absent a hearing prior to suffering criminal liability and the accompanying accrual of fines Delmarva will be compelled to acquiesce in the order. This in turn will impose severe economic penalties on Getty before it has had an opportunity to a due process hearing in this Court on the validity of the order. This Getty asserts would be a denial of its right to due process.

■ The constitutional requirements of procedural due process are neither inflexible nor absolute, Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 162–163, 71 S.Ct. 624, 95 L.Ed. 817 (concurring opinion), and the scope and nature of the procedures demanded are dependent upon a balancing of the precise nature of the governmental function involved and the private interests affected by the governmental action. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) and Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Moreover, when, as here, the issue concerns the timing of judicial review rather than the existence of said review, the procedures which must be afforded to an individual further depend upon the governmental interest in summary enforcement. Goldberg v. Kelly, *supra.*

I have heretofore held that Getty is entitled to litigate its challenge to the validity of the compliance order in this Court. Getty maintains, however, that this remedy, without preliminary relief, is inadequate because of the economic penalty it will be required to pay prior to a final judicial determination of its attack. In support of this contention, Getty relies on several Supreme Court cases holding that an order triggering penalties so encumbering the judicial process as to render resort thereto infeasible is unconstitutional absent prior judicial review. *E. g.*, Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Oklahoma Operating Co. v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920); Natural Gas Pipeline Co. of America v. Slattery, 302 U.S. 300, 58 S.Ct. 199, 82 L.Ed. 276 (1937); and St. Regis Paper Co. v. United States, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961). To the extent that these cases stand for the proposition that cumulative penalties can, in certain circumstances, make pursuit of judicial remedies so burdensome as to deny due process, this Court is in complete accord with them. However, since as has already been discussed, the requirement of procedural due process in a specific type of case depend on the particularized circumstances of that type of case, this observation constitutes the point of departure for the Court's determination and not conclusive support for the plaintiff's position.

■ It is clear that not every governmental action which deprives an individual of a property interest must be proceeded by a complete judicial review, Ewing v. Mytinger & Casselberry, 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); Goldberg v. Kelly, *supra;* Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). The Supreme Court has clearly evinced its con-

of a permit was compatible with environmental concerns. It was, therefore, in a

position of exercising its discretion between lawful alternatives.

clusion that a valid public interest in summary adjudication will support prejudgment seizures in suits to enforce private liabilities, Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1968), see also Hahn v. Burke, 430 F.2d 100 (7th Cir. 1970) and Hall v. Garson, 430 F.2d 430 (5th Cir. 1970); and in suits to protect the public health and safety, *Ewing, supra,* see also Nor-Am Agricultural Products, Inc. v. Hardin, 435 F.2d 1151 (7th Cir. 1970).

The *Ewing* case is particularly pertinent to the plaintiff's due process claim. In *Ewing,* the Supreme Court refused to enjoin a series of libel actions commenced pursuant to the determination of the Secretary of the Food and Drug Administration that there was probable cause to believe that the products subject to the condemnation proceedings were mislabeled. The plaintiff argued that to subject it to a series of multiple seizures and the ensuing libel defenses without providing it with the opportunity to obtain judicial review of the Secretary's probable cause finding would constitute a denial of due process. Regarding the due process claim, the court stated:

> "It is said that these multiple seizure decisions of the Administrator can cause irreparable damage to a business. And so they can. The impact of the initiation of judicial proceedings is often serious. Take the case of the grand jury. It returns an indictment against a man without a hearing. It does not determine his guilt; it only determines whether there is probable cause to believe he is guilty. But that determination is conclusive on the issue of probable cause. As a result the defendant can be arrested and held for trial. See Beavers v. Henkel, 194 U.S. 73, 85 [24 S.Ct. 605, 607, 48 L.Ed. 882]; Ex parte United States, 287 U.S. 241, 250 [53 S.Ct. 129, 131, 77 L.Ed. 283]. The impact of an indictment is on the reputation or liberty of a man. The same is true where a prosecutor files an information charging violations of the law. The

harm to property and business can also be incalculable by the mere institution of proceedings. Yet it has never been held that the hand of government must be stayed until the courts have an opportunity to determine whether the government is justified in instituting suit in the courts. Discretion of any official may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination. Phillips v. Commissioner [of Internal Revenue], 283 U.S. 589, 596–597 [51 S.Ct. 608, 611, 75 L.Ed. 1289]; Bowles v. Willingham, 321 U.S. 503, 520 [64 S.Ct. 641, 650, 88 L.Ed. 892]; Yakus v. United States, 321 U.S. 414, 442–443 [64 S.Ct. 660, 675, 676, 88 L.Ed. 834].

> One of the oldest examples is the summary destruction of property without prior notice or hearing for the protection of public health. There is no constitutional reason why Congress in the interests of consumer protection may not extend that area of control. It may conclude, as it did here, that public damage may result even from harmless articles if they are allowed to be sold as panaceas for man's ills. A requirement for a hearing, as a matter of constitutional right, does not arise merely because the danger of injury may be more apparent or immediate in the one case than in the other. For all we know the most damage may come from misleading or fraudulent labels. That is a decision for Congress, not for us. The decision of Congress was that the administrative determination to make multiple seizures should be made without a hearing. We cannot say that due process requires one at that stage." 339 U.S. at 599–600, 70 S.Ct. at 873.

The Supreme Court has exhibited considerable reluctance to interfere with legislative determinations concerning economic regulations, Ferguson v.

Skrupa, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963). See also Lincoln Federal Labor Union No. 19129 v. Northwestern Iron & Metal Co., 335 U.S. 525, 536–537, 69 S.Ct. 251, 93 L.Ed. 212 (1949). Moreover, it has cited the particular nature of summary adjudication in the public health and safety area in its recent cases evolving the concept of procedural due process. Boddie v. Connecticut, 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); Sniadach v. Family Finance Corp., 395 U.S. 337, 343, 89 S.Ct. 820, 23 L.Ed.2d 349 (1969); Goldberg v. Kelly, 397 U.S. 254, 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

A holding creating a constitutional procedural due process right to pre-enforcement judicial review would permit any person to delay enforcement by raising even a frivolous challenge to the Secretary's determination. Getty's private interest in continuing to do business as it has done in the past is insufficient to frustrate Congress' desires in its regulation of public health and safety. See Ewing, *supra*; Nor-Am Agricultural Products, Inc., *supra*.

█ The Court is of the opinion that the proper procedure to utilize in attempting to avoid economic hardship of the character Getty foresees is the stay procedure suggested in *Abbott Laboratories,* 387 U.S. at 156, 87 S.Ct. 1507, 18 L.Ed.2d 681. See also St. Regis Paper Co. v. United States, 368 U.S. 208, 226, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961). Such a practice permits a court to preclude undue hardship when the facts so merit, but does not straight-jacket the Clean Air Act enforcement procedure at the insistence of every recalcitrant polluter. While the *Abbott Laboratories* case was not decided on constitutional grounds, the Supreme Court's concluding comments regarding the availability of preliminary relief in pre-enforcement judicial review proceedings clearly reflects a view that the plaintiff is not constitutionally entitled to a stay absent evidence which would meet the traditional criteria for such relief. See also General Motors Corporation v. Volpe, 321

F.Supp. 1112 (D.Del.1970), modified, 457 F.2d 922 (3rd Cir. April 5, 1972).

Getty's application for a stay under the APA, 5 U.S.C. § 705, must be judged by the same criteria which control the disposition of its application for a temporary restraining order. Hamlin Testing Laboratories, Inc. v. United States Atomic Energy Commission, 337 F.2d 221 (6th Cir. 1964); Unglesby v. Zimny, 250 F.Supp. 714 (D.Cal.1965). For the reasons heretofore set forth, both applications must be denied.

Submit order.

### SUPPLEMENTAL OPINION

On May 12, 1972, Getty's application for a preliminary injunction was heard. In view of the nature of the proceedings on Getty's application for a temporary restraining order, the Court, with the consent of the parties, has considered Getty's second application on the record made in connection with its first application. For the reasons stated in the Court's Opinion of May 10, 1972, Getty's application for a preliminary injunction must be denied.

Submit order.